IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BILLY ANGLIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 3:20-cv-00180 |
| | ) | |
| SHAWN P. PHILLIPS, Warden, | ) | JUDGE CAMPBELL |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Billy Anglin, a state inmate proceeding pro se, has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. No. 1), challenging the legality of his 1993 conviction in Williamson County Criminal Court. Respondent has filed the record of proceedings in state court (Doc. Nos. 13, 14) and an Answer to the Petition (Doc. No. 15). Petitioner has filed a brief in reply to Respondent's Answer. (Doc. No. 28.)

Having reviewed the parties' arguments and the underlying record, the Court finds that an evidentiary hearing is not required in this matter. As explained below, Petitioner is not entitled to relief under Section 2254, and this action will therefore be dismissed by Order entered contemporaneously with this Memorandum Opinion.

## I. BACKGROUND

### A. Trial Proceedings

Petitioner was indicted by the Hickman County, Tennessee grand jury for crimes stemming from a violent incident that occurred on August 23, 1991. After a late change in venue, Petitioner was tried and convicted in September 1993 (along with two co-defendants, Petitioner's brother Steve Anglin and father John Anglin) in Williamson County, Tennessee, of the offenses of first-

degree murder, attempted first-degree murder, aggravated assault, and reckless endangerment. (Doc. No. 13-4 at 2–5.)[1] He received a total effective sentence of life plus 25 years in prison. (*Id.*)

Petitioner and Steve Anglin jointly appealed their convictions, and the Tennessee Court of Criminal Appeals (TCCA) provided the following summary of the evidence at trial:

> On August 23, 1991, Steve Anglin, accompanied by Billy Anglin and armed with his shotgun, had gotten out of his truck at Dottie's Trailer Park and made statements threatening Buddy Simmons and Linda Lee Anglin, who was married to Johnny Ray Anglin, a brother of the Appellants. He grabbed Mrs. Anglin by the hair, slapped her three or four times, called her a "slut" and threatened to kill her, telling her he was "fixing to blow [her] brains out." He also said "that son of a bitch in the yellow truck's going to get some too." The only yellow truck there belonged to Buddy Simmons.
>
> Mrs. Anglin went into her trailer and called the police. Steve Anglin came into her trailer and said if she was calling the law, he would kill her. She stayed on the telephone until officers arrived, during which time Steve Anglin again threatened to kill her if she had him arrested.
>
> Nonetheless, Mrs. Anglin went to get a warrant for Steve Anglin's arrest, but the sheriff would not allow her to have one issued. She returned to the trailer park to get her five-year-old son whom she had left with Bess Besson.[2]
>
> Neither Steve Anglin nor Billy Anglin were at the trailer park when she arrived. However, while she was at Ms. Besson's trailer, she heard the Anglins arrive. She heard loud music.
>
> Steve Anglin and Billy Anglin were sitting close to one another on the back of a car with the radio in the car playing loudly. Steve Anglin was banging on a garbage can and screaming for someone to make him turn the radio down. There was a shotgun leaning between the men. Linda Anglin got very scared and went back to get a warrant for Steve Anglin's arrest.
>
> As the Appellants sat on the car, Buddy Simmons was seen walking toward the car where the Appellants were sitting. Steve Anglin shot into the ground in front of Buddy and Buddy backed away, after which Steve shot into the ground again.

---

[1]     It appears that the case was brought to trial in Hickman County, but a mistrial was declared before jury selection could be completed (*see* Doc. No. 13-10 at 72–73) and the trial venue was changed to Williamson County.

[2]     At this point, it was evidently late afternoon/early evening and Mrs. Anglin testified it was "starting to get dus[k]y dark." (*See* Doc. No. 13-11 at 160–61.)

2

Buddy stood still while Steve reloaded the gun, then Buddy grabbed the gun and swung it at Steve.

John Anglin, father of Steve and Billy Anglin, lived in the trailer park. Billy went to his father's trailer and said "Daddy, I need the gun." He got a shotgun. As he left the trailer, he put the gun to his shoulder and started swinging it and shooting. One shot hit Ms. Besson, who lived with Buddy Simmons. She had been outside trying to get Mr. Simmons to go back inside their trailer. At the time she was shot, she was returning to her trailer. She was not armed.[3]

Rose Haskins was hit on the "rear end" by one of the shots. She was taken to the hospital. She recovered and testified at the trial.

Mr. Simmons was also hit by one of the shots fired by Billy Anglin and he fell. As Mr. Simmons laid on the ground, Billy Anglin then shot him again. Billy Anglin then went to Mr. Simmons, put the gun to his head and pulled the trigger. It clicked, apparently out of ammunition. Steve Anglin then pulled the shotgun back, put it to Mr. Simmons' head and pulled the trigger. Again, the gun clicked.

Steve Anglin then got down on the ground where Mr. Simmons was lying and was described by a witness as making motions with his hands like he was "carving something up." He then stood up and began kicking and "stomping" Mr. Simmons.

The medical proof revealed that Mr. Simmons had very large and numerous lacerations to his abdomen, chest, back, face, back of his head, ears, over his eyes, to his tongue, arms and legs, as well as a cut throat. The lacerations to his arms were so deep that his bones were visible to his elbows. Parts of his left thigh was blown away by the shotgun blast midway to his buttocks with much of the muscle and tissue in that area blown away. Both bones in his lower left leg were fractured, and his right ulna was fractured. He had an evulsion injury to his right hand and his fifth finger (pinky) was destroyed. Miraculously, Mr. Simmons recovered after extensive medical treatment requiring eleven separate surgeries and forty-nine days of hospitalization at Vanderbilt University Medical Center in Nashville.[4]

---

[3]     It was approximately 9:00 p.m. when Petitioner and his brother returned to the trailer park, and their violent confrontation with Buddy Simmons began shortly thereafter. (*See* Doc. No. 13-10 at 194; Doc. No. 13-11 at 41, 110–11.) Police responded to the scene at "about 9:35 p.m." (Doc. No. 13-10 at 167), when the lamp lighting in the trailer park was "not that great," but "light enough [that] you could see." (*Id.* at 172.) An expert witness for the defense, Dr. Robert Simon, also testified about the expected lighting conditions at the trailer park on the night in question. (Doc. No. 13-12 at 225–38.)

[4]     At this point, the TCCA inserted the following text in a footnote: "Dr. John Thomas Sexton, who examined Mr. Simmons at the Hickman County Hospital described his wounds as the worst he had ever seen in his three years of emergency room experience. He analogized the wounds to 'something that would be seen in a military operation.'"

During the shooting incident, Billy Anglin was heard to say to Mr. Simmons, "What are you going to do now, you son of a bitch?"

The autopsy revealed that Ms. Besson died of gunshot wounds to several vital organs including the left carotid artery, left subclavian artery and multiple left jugular veins. Three pieces of a deer slug were removed from her body. The slug entered her lower neck at the top of her sternum and exited in the area of the left shoulder blade. Ms. Besson was dead at the scene.

A TBI Crime Laboratory forensic expert tested the firearms found at the scene. A shotgun was identified as the weapon from which the fatal .410 gauge shell was fired. Other spent shotgun shells were identified as having been fired from the .12 gauge shotgun found at the scene. Both shotguns were surrendered to law enforcement officers by John Anglin, the father of Billy and Steve Anglin who had picked them up and taken them inside his mobile home. Four live .410 shotgun shells were found in Steve Anglin's left pants pocket.

Brenda Davis testified that immediately after the incident Billy Anglin appeared "calm and collected" and made small talk with her husband as he walked to his trailer, which was located behind Mr. and Mrs. Davis' trailer. Ms. Davis further testified that Steve Anglin "flipped us all a bird" as he was being driven away by the law enforcement officers.

*State v. Anglin*, No. 01C01-9403-CC-00106, 1998 WL 531847, at *1–3 (Tenn. Crim. App. Aug. 25, 1998). Based on this evidence, the jury found Petitioner guilty as charged. (Doc. No. 13-14 at 12–13.) The trial court held a sidebar with counsel after the verdict was read and the jury was polled, and the following ruling was then announced to the jury:

[L]adies and gentlemen, this is a case where the proof of any aggravating circumstances is not great and in my opinion a death penalty can not be sustained. That is now moot since the family of the two victims, the families of the two victims consulted with the district attorney and they have decided to withdraw the allegations of aggravating circumstance. So the court will set penalty of life imprisonment for the two defendants who have been convicted of [first-degree murder].

(*Id.* at 21–22.)

## B. Post-Trial Proceedings

Petitioner filed a post-judgment motion for new trial, which was denied by the trial court. (Doc. No. 13-4 at 42.) Petitioner's conviction and sentence were subsequently affirmed on direct

4

appeal. *State v. Anglin*, 1998 WL 531847. After failing to file an application for permission to appeal to the Tennessee Supreme Court within 60 days of the decision of the TCCA, Petitioner's counsel filed a motion to extend the appeal window, which the Tennessee Supreme Court denied. *See Anglin v. State*, No. M2019-00083-CCA-R3-PC, 2019 WL 6954185, at *2 (Tenn. Crim. App. Dec. 19, 2019) (describing proceedings after affirmance in *State v. Anglin*, *supra*). Counsel did not pursue further relief on direct appeal.

Petitioner timely filed a pro se petition for post-conviction relief, and post-conviction counsel was appointed. (Doc. No. 13-21 at 8–11, 28.) On March 30, 2001, the post-conviction trial court entered an agreed order permitting Petitioner "to file his Petition for Appeal to Tennessee Supreme Court" on direct review despite the lengthy delay, while "[a]ll other issues" in his post-conviction petition were dismissed. (*Id.* at 38.) "Notwithstanding the agreed order, no application for permission to appeal was filed with the supreme court." *Anglin v. State*, 2019 WL 6954185, at *3. Nonetheless, Petitioner's case was reviewed in state court during subsequent years, as later described by the TCCA:

> In 2003, the Petitioner filed pro se pleadings attempting to ascertain the status and amend or reissue the order stating that he shall be permitted to file an application for permission to appeal to the supreme court.
>
> The Petitioner's first post-conviction counsel was permitted to withdraw, and the second post-conviction counsel was appointed. In 2005, the Petitioner's second post-conviction counsel was permitted to withdraw, and the third post-conviction counsel was appointed. The record does not contain evidence of any action on the case until April 2010, when the circuit court clerk notified the third post-conviction counsel that the case would be dismissed on June 30, 2010, unless counsel requested that the case remain open. On July 23, 2010, the post-conviction court dismissed the case for failure to prosecute.
>
> In 2014, the Petitioner filed a pro se motion with the Tennessee Supreme Court, in which he requested the court grant him "pro se status for the purpose of filing his T.R.A.P. Rule 11." The Petitioner detailed his unsuccessful efforts to file an application for permission to appeal through counsel. The supreme court filed an order directing responses from the first post-conviction counsel and the State and,

after those responses were filed, the court found that it did not have a complete record regarding the matter and remanded the case to the post-conviction court for an evidentiary hearing. The court directed:

> In addition to any other issues raised by the parties relative to the motion, the trial court should determine whether the trial court's order purporting to dismiss the post-conviction petition entered in July of 2010 was a nullity given the prior entry of the Agreed Order in April 2001, *see Anthony Perris v. State*, No. W2006-02236-CCA-R3-PC, 2008 WL 2483524 (Tenn. Crim. App. June 19, 2008), and whether [the Petitioner] should be permitted to file an amended post-conviction petition alleging that appellate counsel was ineffective for failing to file timely the application for permission to appeal after the entry of the Agreed Order.

The supreme court also appointed counsel for the Petitioner.

On remand, the post-conviction court received briefs and conducted a hearing. In a written order filed August 14, 2015, the court concluded that the Petitioner had been denied due process in his efforts to pursue a delayed appeal of his convictions. The court determined that the July 23, 2010 order purporting to dismiss the case was void because the court had no jurisdiction to dismiss the case.[5] The court granted the Petitioner a delayed appeal of his convictions and ordered that the remaining post-conviction claims be stayed pending the outcome of the delayed appeal.

The Petitioner filed an application for permission to appeal from the Court of Criminal Appeals' opinion and the judgment affirming his convictions. The Tennessee Supreme Court denied his application on January 14, 2016.

*Anglin v. State*, 2019 WL 6954185, at *3–4.

Petitioner then returned to the post-conviction trial court, where an evidentiary hearing was conducted in November 2017. (Doc. No. 13-26.) The court denied relief in December 2018. (Doc. No. 13-25 at 106–127.) In the order denying relief, the court recognized trial counsel Larry Drolsum's certification as a "Death Qualified" defense attorney and credited his testimony that he "sought to protect Petitioner's life when it appeared the death penalty was still a viable option," before the trial judge unexpectedly "t[ook] the death penalty out of the jury's hands at the conclusion of trial." (*Id.* at 109, 117.) On post-conviction appeal, the TCCA provided the following

---

[5] At this point, the TCCA inserted the following text in a footnote: "Although both orders were issued by the post-conviction court, different judges filed the July 23, 2010 and August 14, 2015 orders."

6

summary of testimony from the only two witnesses at the evidentiary hearing, Petitioner and Mr. Drolsum:

> The Petitioner testified that he had lead counsel and co-counsel for his trial. He said he was tried in Hickman County, which resulted in a mistrial after the discovery that a court officer was related to one of the victims, Buddy Simmons. The Petitioner said he had been unconcerned about a court officer's relationship to Buddy Simmons because the Petitioner and the court officer were friends. The Petitioner said a change of venue occurred, which he opposed. The Petitioner agreed that he was tried jointly with his father and brother. The Petitioner said he wanted his case severed for trial but could not recall the reason his attorneys told him why the cases were not severed. The Petitioner said he had wanted his case severed because his brother had threatened to shoot people when the Petitioner was not present. The Petitioner said a joint trial "got me in the middle of it." Copies of two motions to sever were received as exhibits. The post-conviction court noted that, according to the Court of Criminal Appeals' opinion in the appeal of the convictions, the trial court had denied a motion to sever.
>
> The Petitioner testified that his trial attorneys called Jerry Simmons, who was the Petitioner's first cousin, and "some doctor or something, Simon or something" to testify as defense witnesses. The Petitioner agreed he wanted to call his codefendants, his sister, "and a few other people there at the trailer park that night" as witnesses. He said he wanted his attorneys to call Buddy Simmons to testify about why Buddy Simmons "was over there coming in my area over there where I was at" and to explain "some stuff from years ago between me and him." The Petitioner said twenty to thirty people were present at the trailer park on the night of the crimes. He agreed that if Buddy Simmons had been called as a witness, the Petitioner would have wanted to portray Buddy Simmons as the aggressor. The Petitioner said that if his attorneys had called Boyce Cannon as a witness, he could have testified that he had been with Robby Henson two days before the offenses in this case, when Mr. Henson shot Rose Haskins "in the rear end with a pellet gun." He said showing that Mr. Henson shot Ms. Haskins would eliminate one victim from the crimes with which he was charged. The Petitioner said that his father died in 2003 and that his brother died in 2014. The Petitioner said the eyewitnesses would have testified that he did not hold a gun to Buddy Simmons's head. The Petitioner said that he had not put a gun to Buddy Simmons's head and that the Petitioner's brother had done so after the Petitioner told his brother the gun was out of ammunition.
>
> The Petitioner testified that his trial attorneys should have done more to impeach Ms. Haskins, "Mary," and Ricky Stanley about changes between their preliminary hearing testimony and trial testimony. The Petitioner said his attorneys should have objected to the State's closing arguments that his self-defense theory was "ludicrous and [a] smoke screen," that a State's witness was credible, and that a defense witness lacked credibility. He said his attorneys should have objected, as well, to

the State's posing a question "about all of the victims, bone blood and all of this old shotgun stuff which he didn't know nothing [sic] about." The Petitioner said his attorneys should have objected to the State's argument about how Buddy Simmons felt "while his flesh was being ripped away from his body." The Petitioner thought his attorneys should have objected to the State's argument that the Petitioner's saying "I put a gun to Buddy [Simmons]'s head [was] in Jerry [Anglin]'s statement." The Petitioner claimed this allegation was not in Jerry Anglin's statement.

The Petitioner testified that his trial attorneys advised him not to testify at his trial due to his criminal record and that he did not testify. He said that he wanted to testify but that his attorneys said they "had it." He said his attorneys pursued a self-defense theory but not in the way he wanted and not to the extent he thought they should have. He agreed that he faced the death penalty and that his trial testimony could have been considered during the penalty phase if he had chosen to testify. He said he had four or five prior felony convictions, including convictions for burglary and receiving or concealing stolen property.

The Petitioner testified that he was examined before the trial by Dr. Robert Simon, an optometric physician, and that he was unsure whether Dr. Simon diagnosed him with myopia. He recalled that Dr. Simon said his eyesight was bad. He thought Dr. Simon testified at the trial but said the scope of Dr. Simon's testimony was limited by the trial court. The Petitioner thought Dr. Simon testified about the lighting conditions at the trailer park. When asked if the trial court had not allowed Dr. Simon to testify about the Petitioner's eyesight, the Petitioner said Dr. Simon had examined him after the offenses but before the trial.

     . . .

Regarding delays, the Petitioner testified that he waited two years for a trial. He said one of his attorneys failed to file an application for permission to appeal, which necessitated his filing a post-conviction petition. He said he had an attorney who did not file anything for three to four years, another attorney who did not file anything for a year, and another who did not file anything for five years. He said that more recently, he had an attorney who withdrew after fifteen months because the attorney did not want to raise issues that the Petitioner wanted to raise. He said this attorney wrote to him but did not speak to him in person. The Petitioner said he had tried unsuccessfully for over twenty years to obtain the trial transcripts. Post-conviction counsel informed the court that he had tried unsuccessfully to obtain the sentencing hearing transcript for the Petitioner.

The transcript of a deposition of George Michael "Buddy" Simmons taken in a civil case against the Petitioner was received as an exhibit. The transcript reflects that Mr. Simmons testified in the deposition that he was shot during an altercation with the Petitioner and the Petitioner's brother. Mr. Simmons said that he did not know how many people shot at him and that shots came from different directions. Mr.

8

Simmons said he did not go to the ground when shots hit him and had gone forty to fifty feet toward the source of the shots because he knew he would be shot in the back if he retreated. He said that he grabbed a gun from the Petitioner, who was reloading it, and that the Petitioner's brother got the gun and broke Mr. Simmons's shoulder and leg. Mr. Simmons said that "he" jumped on Mr. Simmons's back and that the Petitioner put a gun between Mr. Simmons's eyes and said, "[H]ow does it feel to know you're fixing to die, you SOB." Mr. Simmons stated that the Petitioner might as well shoot him because Mr. Simmons was "might near gone anyway." Mr. Simmons said that the Petitioner "snapped" the gun, which did not fire, and that the Petitioner's brother cut Mr. Simmons's throat, tongue, and the area over his eyes.

When asked at the post-conviction hearing how he theorized that Mr. Simmons would have been a favorable defense witness in light of the deposition testimony, the Petitioner questioned whether Mr. Simmons had said the Petitioner had a gun to Mr. Simmons's head and had done anything other than shoot Mr. Simmons below the waist. The Petitioner said he had not told Mr. Simmons that Mr. Simmons was going to die and that he had said, "[W]hat [are] you going to do now you son of a b----," when the Petitioner came outside. The Petitioner said Mr. Simmons held a gun and needed only to drop it.

Trial counsel testified that both he and co-counsel were qualified to represent capital defendants and that the Petitioner faced the death penalty. Counsel said he met with the Petitioner at least ten to fifteen times in the two years before the trial. Trial counsel testified that before the first trial ended in a mistrial, he noticed that one of the court officers directed comments toward one of the jurors. Counsel said that he learned Buddy Simmons and the court officer were related and that the trial court granted counsel's motion for a mistrial on this basis. Counsel said the venue was changed from Hickman County to Williamson County for the second trial. Counsel said he explained to the Petitioner that counsel thought a change of venue would be beneficial because no one would know about the details of the case. Counsel noted that the Petitioner had a "stormy past" and had been involved in a United States Supreme Court case regarding the right to counsel for juveniles. Counsel said that the Petitioner was known around Hickman County and that the trailer park where the crimes occurred had a reputation for altercations and police response. Counsel said police officers told him that they had problems with the Petitioner's brother and that the Petitioner's family was "clannish," protected their own, and had their own rules at the trailer park. Counsel said these factors were among the things he considered in deciding to request a change of venue.

Trial counsel testified that another attorney in the case filed a motion for a severance and that he and co-counsel decided to "piggy back" the motion. He said this motion was filed before the first trial and that it was denied. Counsel said the Petitioner had no benefit from a joint trial. Counsel did not recall the circumstances surrounding an agreed order for a joint trial. He later recalled that the attorneys thought it best to proceed with the trial and did not think the trial court would have granted a severance. He said that, as things developed in the first trial, it became apparent

9

that the Petitioner might not be given "a fair shot." Counsel agreed the trial court stated it might reconsider the motion for a severance if the Petitioner chose to testify.

Trial counsel testified that the defense theory was that the shooting had been an accident or mistake when the Petitioner had come to the aid of his brother. Counsel said their theory was that the Petitioner had heard yelling and gone outside with a gun but had tripped off the porch, which caused the gun to fire accidentally.

Trial counsel testified that the Petitioner expressed a desire to testify. Counsel said he was concerned the Petitioner might say something that would cause the jury to impose the death penalty. Counsel said he explained his concern to the Petitioner. Counsel said that the Petitioner made the decision not to testify in consultation with counsel and co-counsel and that the Petitioner agreed with their advice that he should not testify.

Trial counsel testified that although he could not recall an issue regarding Steve Anglin's statement of intent to kill Buddy Simmons, he believed such a statement would have been admissible as a hearsay exception.

Trial counsel testified that he and his investigator talked to Buddy Simmons before the trial. Counsel said that the investigator did the first round of interviews of the witnesses and that written summaries of their statements were provided to the Petitioner. Counsel said he later interviewed the State's witnesses and other important witnesses and tried to determine "where the mistakes were being made by the witnesses." He said questions existed as to whether any of them remembered accurately what had happened. He said that he and co-counsel used the written summaries of the witnesses' prior statements when cross-examining the witnesses and that they were prepared for fourteen potential witnesses. Counsel thought they had been able to neutralize some of the State's proof through cross-examination. He said a female witness testified that she thought "it was just an accident." Counsel said that although the Petitioner thought some of the State's witnesses might provide testimony that was favorable to the defense, this was not the case after two rounds of witness interviews.

Trial counsel testified that he took the position that Mr. Simmons had been the aggressor. Counsel said he did not call Mr. Simmons as a defense witness because Mr. Simmons would not have been helpful. Counsel said Mr. Simmons did not like the Petitioner and, in counsel's opinion, the Petitioner's best interests were not served by calling Mr. Simmons as a defense witness. Counsel said that if Mr. Simmons had been called as a defense witness and had testified consistently with his testimony in the civil deposition, the jury might have been more inclined to impose the death penalty. Counsel said that "the victim" was related to a Centerville police officer and that he thought the State pursued the death penalty because a police officer's "brother, uncle, or cousin" had been injured.

Trial counsel testified that after the trial began, he became aware he needed to convey to the jury the lighting conditions at the trailer park. He said he obtained the trial court's approval for Dr. Simon to serve as a defense expert. Counsel said Dr. Simon used instruments which tested the amount of light at the scene. Counsel said he did not anticipate any issues with the admissibility of Dr. Simon's testimony because the court had appointed Dr. Simon as an expert. Counsel said the court permitted Dr. Simon's testimony regarding the lighting conditions. Counsel said, however, the court would not allow Dr. Simon to testify about the Petitioner's vision two years after the offenses because of the possibility of changes over time. . . .

*Anglin v. State*, 2019 WL 6954185, at *4–7.

## II. CLAIMS OF THE PETITION

The Petition before the Court (Doc. No. 1) asserts the following claims:

(1)    Trial counsel failed to present an adequate defense and was constitutionally ineffective in:

    (a)    advising Petitioner not to testify;

    (b)    failing to object to inadmissible hearsay testimony concerning Steve Anglin's statement reflecting his intent to kill Buddy Simmons and Linda Anglin;

    (c)    failing to call Buddy Simmons to testify that his issue was with Steve Anglin, not Petitioner;

    (d)    failing to call Boyce Cannon to testify that Rose Haskins had been shot in the days prior to the incident at the trailer park;

    (e)    failing to keep the trial in Hickman County, where "the venire would hav[e] been more sympathetic to Petitioner"; and

    (f)    failing to object to improper statements made by the State during closing arguments.

(2)    Petitioner was denied due process when the State deprived him of a meaningful post-conviction process, leaving him unable to present proof of trial counsel's ineffectiveness in failing to call Buddy Simmons and Boyce Cannon as trial witnesses—proof that he could not present on direct review because trial counsel (who also represented Petitioner on direct appeal) would not raise the issue of their own ineffectiveness.

11

(Doc. No. 1 at 6–11.)

## III. ANALYSIS

**A. Legal Standard**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[6] A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo

---

[6] Although Petitioner was tried, convicted, and sentenced in 1993, his habeas petition was not filed until 2020, "so it is subject to the requirements of [AEDPA], which became effective on April 24, 1996." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 840–41 (6th Cir. 2017).

12

review to determine whether "the relevant state court had erred on a question of constitutional law or on a mixed constitutional question." *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent

13

judgment," finds it erroneous or incorrect. *Williams*, 529 U.S. at 411. Rather, to be actionable under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. *Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Davis v. Ayala*, 576 U.S. 257, 271 (2015). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen*

*v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102; *see also Woods*, 575 U.S. at 316.

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Title 28 U.S.C. §§ 2254(b) and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner has presented the same claim sought to be redressed in federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that, as of the time of the habeas petition's filing, there can no longer be any available state remedy for any of its claims; if a state remedy is available for any habeas claim, the entire petition must be dismissed. *Id.* at 522. A habeas petition is thus fully exhausted if each and every claim was first fairly presented to the state appellate court[7] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

---

[7] In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

15

However, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts.") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds," typically a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the claim will ordinarily be barred from federal habeas review because of its procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[8]

---

[8] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it

then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error asserted in his defaulted claim "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

---

for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

17

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to the bar of an unexcused default in cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, the petitioner would need to demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

**B. Petitioner's Claims**

As recited above, Petitioner claims that he was deprived of his rights to the effective assistance of counsel (Claim 1) and due process of law (Claim 2). As a preliminary matter, prior to asserting the claim of trial counsel's ineffectiveness, Claim 1 of the Petition begins with the words "[s]ufficiency of the evidence." (Doc. No. 1 at 6.) In his Reply to Respondent's Answer, Petitioner fleshes out this bare reference to the sufficiency of the evidence by asserting that his brother, Steve Anglin, "would have testified in the Petitioner's defense" at his post-conviction evidentiary hearing had Steve not died during Petitioner's long wait for that hearing. (Doc. No. 28 at 16–17.) This is obviously not a claim that the evidence *at trial* was insufficient—both Petitioner and Steve Anglin raised that claim in their joint appeal, resulting in the TCCA's ruling "that there was ample, indeed overwhelming evidence from which any rational trier of fact would find the

18

Appellants guilty of all of the offenses just as the jury did." *State v. Anglin*, 1998 WL 531847, at *3. This Court does not construe the Petition as seeking habeas relief from that ruling.

Alternatively, even if the Petition is properly construed as presenting a challenge to the sufficiency of the evidence against Petitioner, any claim of insufficiency of the convicting evidence is without merit under AEDPA due to the TCCA's reasonable determination quoted above, and any claim of the insufficiency of post-conviction development of the record is not cognizable in federal habeas, as further discussed below in adjudicating Petitioner's due process claim. *See*, *e.g.*, *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration").

1. Claim 1 – Ineffective Assistance of Counsel

In Claim 1, Petitioner asserts that his constitutional right to the effective assistance of counsel was violated, enumerating six ineffective-assistance sub-claims. The first five sub-claims were exhausted on post-conviction appeal before the TCCA, which decided them on their merits. As to the sixth sub-claim, the TCCA found that Petitioner was not entitled to relief because he waived review of that sub-claim.

Claims of ineffective assistance of counsel are subject to the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action

19

'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether the petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to Petitioner's claims of ineffective assistance. *Anglin v. State*, 2019 WL 6954185, at *8. Accordingly, the critical question is whether the TCCA applied *Strickland* reasonably in reaching its conclusions on each ground raised by Petitioner.

20

a. <u>Advice Against Testifying</u>

The TCCA rejected Petitioner's claim that counsel was ineffective in advising him not to testify in his own defense, as follows:

> The post-conviction court found that the Petitioner and his trial attorneys discussed the Petitioner's right to testify, that the Petitioner wanted to testify, that his attorneys advised against it because of the risk of the Petitioner's saying something that might make the jury more inclined to recommend a death sentence, and that the Petitioner elected to follow his attorneys' advice about not testifying. The post-conviction court found that the Petitioner failed to show that his attorneys performed deficiently in advising him not to testify.
>
> On review, the record supports the post-conviction court's determination. The Petitioner was advised of his right to testify and elected to follow his trial attorneys' advice. His attorneys' advice that he not testify was based upon their concerns about his testimony adversely affecting the jury and making the possibility of a death sentence more likely. We note, as well, that the Petitioner did not testify at the post-conviction hearing about the facts to which he would have testified if he had elected to take the stand at his trial. Although post-conviction counsel argues that the Petitioner would have testified that he was unable to see what he shot on the night of the crimes, the transcript of the post-conviction hearing does not contain the specifics about which the Petitioner claims he would have testified. The Petitioner merely testified generally at the hearing that he thought they were relying on a self-defense theory and that he "wanted to get up there and tell [his] story." To the extent that the Petitioner addressed any question about whether he had poor eyesight, his post-conviction testimony centers on the trial court's ruling regarding the admissibility of Dr. Simon's prospective testimony about the Petitioner's eyesight. Without knowing how the Petitioner might have testified, the post-conviction court had no basis from which it might conclude that he suffered prejudice from following his attorneys' advice not to testify. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). In addition, the Petitioner's post-conviction testimony that he wanted to tell his story in furtherance of a self-defense theory is not consistent with his argument on appeal that his eyesight was so poor he could not have seen where he shot. The post-conviction court did not err in denying relief on this basis.

*Id.* at *9.

This determination is reasonable. Petitioner's post-conviction testimony that he wanted "to get up there [on the witness stand] and tell [his] story" (Doc. No. 13-26 at 26–27) cannot overcome

his admission that he "trusted" counsel and agreed (with some hesitation) to follow their advice (*id.* at 56) based on the legitimate concern that, in this case where Petitioner clearly fired the shot that claimed the life of Ms. Besson, any testimony he gave could provoke the jury to impose a sentence of death. (*Id.* at 75–77.) The TCCA reasonably applied *Strickland* in finding that Petitioner failed to prove that counsel performed deficiently in advising him not to testify. Moreover, the TCCA reasonably found that Petitioner failed to establish prejudice from being unable to testify to his poor vision, given his failure to proffer the specific testimony he would have given on that topic and the trial court's ruling that subsequent measurements of his visual acuity could not be used to establish acuity at the time of the shootings. Petitioner is not entitled to habeas relief on this sub-claim.

b. <u>Failure to Object to Inadmissible Hearsay Testimony</u>

Petitioner claims that trial counsel ineffectively failed to object to hearsay testimony that Steve Anglin stated he intended to kill Buddy Simmons and Linda Anglin. As the TCCA noted, the post-conviction trial court found that this out-of-court statement attributed to Steve Anglin "was admissible [against Petitioner] as a hearsay exception for an admission of a party opponent," and therefore concluded that "Petitioner's trial attorneys had not provided ineffective assistance." *Anglin v. State*, 2019 WL 6954185, at *10. The TCCA analyzed this sub-claim as follows:

> Tennessee Rule of Evidence 803(1.2)(E) provides a hearsay exception for "[a] statement offered against a party that is ... a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." The Petitioner has not identified a reason why the post-conviction court erred in concluding that the evidence fell under this hearsay exception, and we decline to speculate as to the Petitioner's unstated reasoning. We conclude that the post-conviction court did not err in determining that the Petitioner failed to prove his ineffective assistance of counsel claim and that the court properly denied relief on this basis.

*Id.* Petitioner has provided no grounds, in either his Petition or his Reply, for finding this determination unreasonable, nor does the Court find it to be an unreasonable application of *Strickland*. Accordingly, habeas relief is not warranted on this sub-claim.

### c. Failure to Call Buddy Simmons to Testify

The TCCA reviewed and analyzed this sub-claim as follows:

The Petitioner contends that his trial attorneys were ineffective because they failed to call Buddy Simmons as a defense witness. He argues that Mr. Simmons, who was deceased by the time of the post-conviction hearing, would have testified that he had an issue with Steve Anglin, not the Petitioner. The post-conviction court found that Mr. Simmons had provided deposition testimony which was unfavorable to the Petitioner in a related civil case, that trial counsel's investigation showed Mr. Simmons did not like the Petitioner, and that the Petitioner's trial attorneys made a strategic decision not to call Mr. Simmons because they thought his testimony "might have heightened the jury's awareness to the death penalty." Thus, the court concluded that the Petitioner had failed to show his attorneys performed deficiently, and it denied his ineffective assistance of counsel claim as to this issue.

Although the Petitioner claimed at the post-conviction hearing that Steve Anglin, not the Petitioner, put a gun to Mr. Simmons's head, Mr. Simmons testified in the civil deposition that the Petitioner held the gun to Mr. Simmons's head and asked Mr. Simmons how it felt to know he was about to die. Trial counsel testified at the post-conviction hearing that he made the decision not to call Mr. Simmons because his investigation showed that Mr. Simmons would not be a favorable witness and might cause the jury to be more inclined to recommend a death sentence. The record supports the post-conviction court's determination that the Petitioner failed to show that his attorneys performed deficiently. In view of the evidence regarding Mr. Simmons's potential damaging testimony as a defense witness at the Petitioner's trial, the Petitioner has failed to show how he was prejudiced, as well. The post-conviction court did not err in concluding that the Petitioner failed to prove his ineffective assistance of counsel claim and in denying relief on this basis.

*Id.* at *10–11. Without question, counsel's strategic decision that the testimony of victim Buddy Simmons could only hurt Petitioner's case, and therefore that he would not be called as a defense witness, cannot be second-guessed on habeas review, where "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. The TCCA reasonably applied *Strickland* to find no deficient

performance or prejudice resulting from counsel's decision not to call Simmons. This sub-claim has no merit.

### d. Failure to Call Boyce Cannon to Testify

The TCCA reviewed and analyzed this sub-claim as follows:

> The Petitioner contends that his trial attorneys were ineffective because they did not call Boyce Cannon to testify as a defense witness. He claims Mr. Cannon would have testified that Ms. Haskins had been shot a few days before the crimes, rather than during the incident. The post-conviction court found that even if Mr. Cannon had testified for the defense, the Petitioner had not shown that his convictions for the offenses related to victims other than Ms. Haskins would have been affected. Thus, the court concluded that the Petitioner had not shown that his attorneys performed deficiently or that he had been prejudiced by their performance, and it denied relief on this basis.
>
> The record reflects that Mr. [Cannon] did not testify at the post-conviction hearing and that the only evidence of how he might testify came from the Petitioner, who claimed Mr. [Cannon] would have testified that Robby Henson, who was deceased by the time of the post-conviction hearing, shot Rose Haskins "in the rear end with a pellet gun." As we have stated, a petitioner who claims his attorneys should have presented a defense witness at trial should call the witness to testify at the post-conviction hearing. *See Black*, 794 S.W.2d at 757. Because the Petitioner failed to present evidence to support his claim by calling Mr. [Cannon] as a post-conviction witness, the post-conviction court did not err in denying relief on this basis.

*Anglin v. State*, 2019 WL 6954185, at *11.

In his Reply, Petitioner asserts that he "told his post-conviction attorney that he wanted to subpoena Mr. Cannon, however his attorney failed to have Mr. Cannon come to court as a witness." (Doc. No. 28 at 19.) But this alleged "failure to develop the state postconviction record" is the sort of attorney error for which habeas petitioners must bear responsibility, in light of the fact that "there is no constitutional right to counsel in state postconviction proceedings." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1735 (2022) (citations omitted); *see also*, *e.g.*, *Hugueley v. Mays*, 964 F.3d 489, 500 (6th Cir. 2020) ("Since a petitioner has no Sixth Amendment right to counsel in a post-conviction proceeding, it therefore follows that counsel cannot be ineffective for not taking all

possible steps to fully develop the claim that the petitioner wishes she had."). Not only does this

sub-claim fail for lack of evidence showing prejudice, as the TCCA reasonably determined,[9] but

also Petitioner's proffer of Cannon's expected testimony is contradicted in the record, by the

testimony of the responding paramedic that Rose Haskins's wounds were fresh, not days old, and

were inconsistent with a pellet or BB. (Doc. No. 13-11 at 27–33.) Petitioner is not entitled to relief

on this sub-claim.

### e. Failure to Keep the Trial in Hickman County

The TCCA reviewed and analyzed this sub-claim as follows:

The Petitioner contends that his trial attorneys were ineffective relative to the change of venue. The Petitioner argues in his brief that a Hickman County jury would have been more sympathetic to him than was the Williamson County jury. The Petitioner has not identified any factual or legal basis for this assertion.

The Petitioner testified at the post-conviction hearing that he opposed the change of venue, which occurred after the first trial ended in a mistrial. Trial counsel testified that a Hickman County court officer and one of the victims were friends, that a police officer and one of the victims were related, and that the Petitioner and his brother had a bad reputation in the community. In counsel's opinion, the Petitioner had a better change of receiving a fair trial in Williamson County. The post-conviction court found that counsel made an informed, tactical decision to agree to a change of venue. Thus, the post-conviction court concluded that the Petitioner was not entitled to relief.

On review, the record supports the post-conviction court's determination. After a mistrial occurred due to a friendship between a court officer and a juror and after consideration of several factors which trial counsel thought might affect the likelihood of the Petitioner's receiving a fair trial in Hickman County, counsel consented to a change of venue to Williamson County. The record supports the court's determination, and the court did not err in denying relief on this basis.

*Anglin v. State*, 2019 WL 6954185, at *10. This, again, is a reasonable application by the TCCA

of *Strickland* to find that counsel's choice, made after due consideration of the tactical advantages

---

[9]     *See Troglin v. Westbrooks*, No. 1:12-CV-41, 2014 WL 5810312, at *11 (E.D. Tenn. Nov. 7, 2014) ("Given petitioner's failure to offer testimony at the post-conviction hearing to demonstrate prejudice flowed from the absence of . . . testimony at trial, the state court did not unreasonably apply *Strickland* when it rejected this claim.") (citing *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002)).

and disadvantages of the proposed change in venue, was a strategic decision that is unassailable on collateral review. Plaintiff's claim to the contrary is without merit.

### f. Failure to Object During State's Closing Argument

Petitioner claims that his defense attorneys were ineffective in failing to object to improper statements made by the State during closing argument. The TCCA addressed this sub-claim as follows:

> The Petitioner contends that his trial attorneys provided ineffective assistance of counsel because they did not object to "improper statements" made during the State's closing arguments. The Petitioner's brief does not identify the alleged improper statements to which he claims his attorneys should have objected, nor does it contain any legal support for a conclusion that such statements were objectionable. At the post-conviction hearing, the Petitioner testified that his attorneys did not object to argument that his self-defense theory was "ludicrous" and a "smoke screen," that a defense witness was incredible, that the victims were "bone blood and all of this old shotgun stuff," that the prosecutor wondered how Buddy Simmons felt while "his flesh was being ripped away from his body," that the prosecutor believed the testimony of a State's witness, and that Jerry Anglin's statement said the Petitioner put a gun to Mr. Simmons's head when the statement did not say this.
>
> Relative to the claims related to the State's attack on the self-defense theory and to the State's characterization of the defense theory as "ludicrous" and a "smoke screen," the post-conviction court found that the Court of Criminal Appeals had denied relief in the appeal of the convictions [where the appellants had raised issues of trial court error in allowing the statements without admonishment and prosecutorial misconduct in making them].[10] As to the remaining allegations of ineffective assistance related to failure to object to closing arguments, the post-conviction court noted that these issues had not been raised in the petition or amended petitions and that the Petitioner had not provided the post-conviction court with a trial transcript of the closing arguments. The post-conviction court concluded that the Petitioner had not met his burden of showing how "these comments denied him a right to a fair trial."
>
> The post-conviction court correctly noted that the petition and amended petition do not contain an allegation of ineffective assistance of counsel for failing to object to the closing arguments. The original petition alleged (1) trial court error in failing to admonish the State for unspecified, allegedly improper closing arguments and (2) prosecutorial misconduct for unspecified, alleged improper closing arguments. Neither of these allegations cast the issue as one of the ineffective assistance of

---

10    *See State v. Anglin*, 1998 WL 531847, at *4–6.

counsel. The post-conviction court did not address these allegations in terms of whether the Petitioner had received the ineffective assistance of counsel, which is how the issue is raised on appeal. The post-conviction court cannot be faulted for not addressing the issue as a question of whether the Petitioner was deprived of the effective assistance of counsel when the Petitioner had failed to raise the issue in his petitions.

As a general proposition, this court will not address issues that were not raised in the post-conviction petition or addressed by the post-conviction court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1991); *see State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) (stating that issues raised for the first time on appeal are waived). Because the Petitioner failed to raise an ineffective assistance of trial counsel allegation related to his attorneys' failure to object to specific portions of the State's closing arguments, thereby depriving the post-conviction court of the opportunity to adjudicate this claim, we conclude that our consideration of the issue, at this juncture, is waived. The Petitioner is not entitled to relief on this basis.

*Anglin v. State*, 2019 WL 6954185, at *11–12.

Tennessee's waiver rule applicable to post-conviction proceedings, Tenn. Code Ann. § 40-30-106(g), provides that, subject to two exceptions not pertinent here, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Thus, "[a]n issue not presented in a petition for post-conviction relief may not be raised for the first time on appeal." *Beechem v. State*, No. W2010-02271-CCA-R3-PC, 2012 WL 2514904, at *6 (Tenn. Crim. App. July 2, 2012), *perm. app. denied* (Tenn. Oct. 16, 2012). The Sixth Circuit has found that the application of Tennessee's post-conviction waiver rule is an independent and adequate state ground for decision that bars federal habeas review, unless cause and prejudice excusing the procedural default is shown. *Cone v. Bell*, 243 F.3d 961, 969–71 (6th Cir. 2001), *overruled on other grounds by Bell v. Cone*, 535 U.S. 685 (2002)).

Petitioner makes no attempt to demonstrate cause and prejudice excusing his default of this sub-claim. Accordingly, it is barred from review in this Court.

In his Reply, Petitioner for the first time asserts improprieties in the closing argument of Attorney Bates (counsel for Steve Anglin) and in the opening statements of both Bates and Petitioner's counsel. (Doc. No. 28 at 18.) Specifically, he asserts that "Bates stated at the opening statements that the Petitioner was the killer," while Petitioner's counsel merely "discussed the prior events which occurred approximately a year before the altercation and events that occurred between the Petitioner and Buddy Simmons." (*Id.*) Petitioner further asserts that, in closing argument, "Bates stated to the jury that 'the only thing the Defendants were guilty of was going too far,'" which implied "that the Petitioner was in fact guilty." (*Id.*) Regardless of whether these assertions are construed as arguments supporting Petitioner's claim of trial counsel's ineffective failure to object to improper statements, or as facts supporting a new constitutional claim, they are not properly raised in the Reply and the Court therefore will not consider them. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 311–12 (6th Cir. 2011) (finding that "district court properly declined to address . . . grounds for relief" first asserted in habeas petitioner's traverse, or reply) (citing *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005)); *cf. Royster v. Warden, Chillicothe Corr. Inst.*, No. 18-3362, 2018 WL 8138770, at *2 (6th Cir. Aug. 23, 2018) (finding that "[w]hile Royster's traverse claims share a common legal theory as those in his petition—trial and appellate counsels' alleged ineffectiveness—they concern new factual bases that were not presented in his petition and thus are new claims" that were not properly before the district court).

2. Claim 2 – Due Process

Petitioner claims that he was denied due process when the State delayed his ability to proceed to a post-conviction evidentiary hearing until 2017, by which time all potential witnesses except Boyce Cannon had died. Petitioner asserts that this delay prejudiced his ability to present proof of trial counsel's ineffectiveness—proof that he was not previously able to present because

28

counsel (who also represented Petitioner on direct appeal) would not raise the issue of his own ineffectiveness.[11] (*See* Doc. No. 1 at 6–11; Doc. No. 28 at 18–19; *see also* Doc. No. 13-25 at 27–28 (Petitioner's pro se "Closing Statements" to the post-conviction trial court, identifying names and expected testimony of witnesses he would have called but for delay).)

The TCCA analyzed this claim as follows:

The Petitioner contends that he was denied due process by the lengthy delay between the filing of his post-conviction petition in 1999 and the 2017 hearing. He argues that he did not have a fair hearing because memories had faded and witnesses had died. The State counters that no due process violation occurred and notes that any delay cannot be attributed to the State.

The post-conviction court found that the Petitioner had been denied due process because of the delay between the filing of his post-conviction petition and his receiving a delayed appeal of his conviction proceedings in the form of an application for permission to appeal to the Tennessee Supreme Court. The post-conviction court found, however, that the Petitioner had received relief in the form of the delayed appeal and that the supreme court had acted on his application by denying permission to appeal. Thus, the post-conviction court concluded that the Petitioner had been afforded a remedy for the due process violation. The court also found that to the extent the Petitioner claimed he had been abandoned by his post-conviction counsel, he had no constitutional or statutory right to the effective assistance of counsel in a post-conviction proceeding, pursuant to *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995).

In the post-conviction realm, due process requires merely that the petitioner have "'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *House*, 911 S.W.2d at 711 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *see Stokes v. State*, 146 S.W.3d 56, 61 (Tenn. 2004). Although the delay in this case was significant, the record reflects inaction on the part of the Petitioner and his attorneys for years at a time. In any event, the Petitioner was afforded a hearing, at which he was allowed to testify at length as to his alleged grievances. The post-conviction court filed a lengthy, detailed order addressing all of the issues raised. Ultimately, the court found that the Petitioner failed to prove his claims on

---

[11]     The Petition asserts a separate claim based on trial/appellate counsel's ineffective failure to raise their own ineffectiveness. (*See* Doc. No. 1 at 11.) But because ineffective assistance of trial counsel is "virtually impossible" to prove without an evidentiary hearing, *State v. Blackmon*, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citation omitted), and Tennessee courts have "overwhelmingly communicated" that such claims are best resolved in post-conviction proceedings, *Sutton v. Carpenter*, 745 F.3d 787, 795 (6th Cir. 2014), counsel could not have been constitutionally ineffective in failing to raise the claims prior to the post-conviction stage of the case. Accordingly, the Court liberally construes Petitioner's third asserted habeas claim in conjunction with his assertion of his due process rights in Claim 2.

29

the merits. The court properly determined that the Petitioner was not entitled to relief on his due process claim related to the post-conviction claims other than the delayed appeal.

*Anglin v. State*, 2019 WL 6954185, at *12.

Errors in state collateral proceedings are ordinarily "outside the scope of federal habeas corpus review" because such errors, even if they amount to a deprivation of due process, do not directly pertain to the determination of whether the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States" under 28 U.S.C. § 2254(a). *Cress*, 484 F.3d at 853. In this case, however, Petitioner argued before the state courts that the egregious delay in his post-conviction proceedings not only amounted to an erroneous disruption of those proceedings, but also prejudiced his only meaningful opportunity to establish the merit of his Sixth Amendment claim that trial counsel was ineffective in failing to call trial witnesses—a claim which *does* directly pertain to the legality of his custody. (*See* Doc. No. 13-25 at 25–36 (citing, *e.g.*, *Martinez v. Ryan*, 566 U.S. 1 (2012)); Doc. No. 13-28, Petitioner's Post-Conviction Appellate Brief, at 13 (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("the only way" a petitioner can establish prejudice from trial counsel's failure to call witnesses at trial is to present the witness at the post-conviction evidentiary hearing)).)

Nevertheless, under AEDPA, for habeas relief to be granted on this claim which the state courts adjudicated on its merits, that adjudication must have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And, if the state adjudication stood in such relationship to Supreme Court-determined federal law, the underlying due process violation must have "had substantial and injurious effect or influence" upon

30

Petitioner's conviction—in other words, it must not have been harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

In *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832 (6th Cir. 2017), the Sixth Circuit considered a habeas petitioner's argument that the framework for post-conviction review in Ohio violated his due process rights because it denied him an "adequate corrective process." *Id.* at 854. The petitioner had argued before the district court that the state post-conviction process was inadequate for obtaining review of claims which, as recognized by the Supreme Court in *Martinez v. Ryan* and *Trevino v. Thaler*,[12] "can only be brought for the first time on postconviction," whereas on appeal he asserted that the post-conviction corrective process in Ohio is so inadequate that it is "little more than a ritual." *Id.* In affirming the denial of this claim, the Sixth Circuit first noted that, under its precedent, habeas corpus cannot be used to challenge a state's scheme of post-conviction relief. *Id.* at 855 (citing, *e.g.*, *Cress*, 484 F.3d at 853). The court then proceeded to determine that, "[m]ore to the point, in the absence of Supreme Court precedent evaluating the constitutional adequacy of state post-conviction review proceedings, Leonard cannot establish the necessary precondition for issuance of the writ—namely, that the decision of the Ohio Court of Appeals, which clearly evaluated the merits of his claim, 'was contrary to, or

---

[12] In *Martinez*, the Supreme Court recognized, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim" of trial counsel's ineffectiveness, when that claim could not have been raised on direct appeal because of state procedural rules. 566 U.S. 1, 13 (2012). In such cases, the Court carved out a "narrow exception" to the rule that post-conviction counsel's ineffectiveness is a risk borne by the petitioner, allowing such ineffectiveness during initial post-conviction proceedings to excuse the procedural default of a substantial claim of trial counsel's ineffectiveness. *Id.* at 9, 13–14.

In *Trevino*, the Supreme Court extended the application of *Martinez* to states with procedural frameworks that do not preclude an ineffective-assistance claim on direct appeal, but make it unlikely that the opportunity to raise that claim at that time will be a meaningful one. 569 U.S. 413, 429 (2013). The Sixth Circuit then held in *Sutton* that, under Tennessee's procedural scheme, the initial post-conviction proceeding is the first meaningful opportunity to raise a claim of ineffective assistance of trial counsel. 745 F.3d at 795–96.

Case 3:20-cv-00180   Document 29   Filed 03/03/23   Page 31 of 33 PageID #: 4341

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* (quoting § 2254(d)(1)). Implicit in this determination is a rejection of the notion that the equitable rule of *Martinez* and *Trevino*, allowing habeas courts to reach certain defaulted claims, established any rule concerning the sufficiency of state post-conviction procedures.

So too in the case at bar, Petitioner has not argued, nor can he establish, that the TCCA's ruling that he ultimately received all the process he was due in post-conviction trial court was contrary to, or unreasonably applied, any decision of the U.S. Supreme Court. Neither can Petitioner establish that he was prejudiced by any error in the state courts' denial of "relief on his due process claim related to the post-conviction claims other than the delayed appeal," *Anglin v. State*, 2019 WL 6954185, at *12, because, as detailed above, those courts based their denial of his ineffective-assistance claims on failure to meet his burden of proving both deficient performance and resulting prejudice, not strictly on failure to offer testimony from witnesses now deceased. Petitioner is not entitled to habeas relief on his due process claim.

## V. CONCLUSION

For the reasons stated above, Petitioner is not entitled to relief under Section 2254 and this action will therefore be **DISMISSED**.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree

that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order is filed herewith.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE